IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


AMY C. ASHCRAFT

        Plaintiff,

v.                                       Civil Action No. 3:12-cv-113


CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

        Defendant.


**REPORT AND RECOMMENDATION**

**I.  INTRODUCTION**

**A. Background**

On September 26, 2012, Amy C. Ashcraft, filed this action under 42 U.S.C. §§ 405(g) and 1383(c) for judicial for review of the decision of the Commissioner of Social Security that denied her claims for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 401-433, 1381-1383f. The Commissioner filed his Answer to this Complaint on December 17, 2012. Ms. Ashcraft and the Commissioner then filed cross motions for summary judgment, followed by Ms. Ashcraft's response to the Commissioner's motion. The motions are now ripe for this Court's review, and for this report and recommendation.

**B. The Pleadings**

    1. Ms. Ashcraft's Motion for Summary Judgment and Memorandum in Support.

    2. Commissioner's Motion for Summary Judgment & Memorandum in Support.

3. Ms. Ashcraft's Reply to Commissioner's Motion.

## C. Recommendation

I recommend that:

1.     Ms. Ashcraft's Motion for Summary Judgment be **DENIED** because (1) the ALJ performed the heightened duty required when a claimant appears unrepresented, and fully developed the case as she was required; (2) there was little to no conflicting evidence in the record which warrants further consideration by the ALJ; and (3) there was nothing improper about the hypothetical posed to the vocational expert.

2.     Commissioner's Motion for Summary Judgment be **GRANTED** for the reasons set forth.

## II. FACTS

### A. Procedural History

Ms. Ashcraft applied for benefits in October 2008, claiming disability since September 2, 2007 due to anxiety, bipolar disorder, and neck and shoulder problems. (R. 139-141, 43.) The application for benefits was denied in the first instance, and upon reconsideration. (R. 67-69, 72-74.) Ms. Ashcraft then requested a hearing before an Administrative Law Judge (ALJ), which was held on November 2, 2010. Ms. Ashcraft waived her right to counsel and testified at the hearing, as did an impartial Vocational Expert (VE). On January 5, 2011, the ALJ issued an unfavorable decision finding that Ms. Ashcraft was not disabled. She appealed the decision to the Appeals Council (AC), which denied review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. The instant action timely followed.

**B. Personal History**

Ms. Ashcraft was born in 1978, making her a younger individual under the Act, is married, and has one son from a previous marriage. She graduated high school and has completed a degree program to become a teacher. Moreover, she was working on a second degree in graphic design, but discontinued that study because of its affects on her mental health. She has previously worked as a storm chaser, construction laborer, waitress, and graphic designer.

**C. Medical History**

*1. Mental Health*

Initially, Ms. Ashcraft was given Xanax by her treating doctor to help with her nerves, but was referred to psychiatry in November 2005. (R. 295.) Ms. Ashcraft was seen at the United Summit Center for a period from January 2006 to January 2007. In her initial psychiatric intake evaluation on January 27, 2006, Ms. Ashcraft complained of "racing thoughts, irritability, and poor sleep," that had been interfering with her college courses. (R. 260.) She reported past history of panic attacks and depression, and had been prescribed an array of antidepressants that she claimed made things worse. (*Id.*) Richard Cook, PAC, who performed this evaluation, noted that Ms. Ashcraft made good eye contact, and had fair insight and judgment. (*Id.*) However, he also noted that her mood was a little anxious, her affect was restricted, and her sleep was poor. (*Id.*) The doctor's impression was that Ms. Ashcraft suffered from Mood Disorder NOS, and untreated general anxiety and mood disorder. (*Id.*)

At a follow up appointment in March 2006, John Stevens, MA,[1] noted that Ms. Ashcraft was tired, easily distracted, and a bit depressed, but otherwise normal. (R. 259.) Mr. Stevens further noted that she had made some progress, her mood had improved, and her agitation decreased. (*Id*.) Ms. Ashcraft again noted that she was not depressed, only that she cannot relax and is constantly nervous. (*Id*.) At the next 90 day check up, Mr. Stevens again noted that Ms. Ashcraft was tired, easily distracted and a bit depressed. (R. 250.) Moreover, he noted further progress, stating that her mood had improved and her panic attacks had decreased to mild; he attributed the decrease to Ms. Ashcraft's withdrawal from school. (*Id*.) Ms Ashcraft reported that the medicine was helping her think more clearly, but that she still had problems relaxing, sleeping, and concentrating. (*Id*.) Yet more improvement was noted at the October 2006 appointment. (R. 239.) At last report from the Summit Center, Ms. Ashcraft's condition had deteriorated, and further treatment for her diagnosed Panic Disorder without Agoraphobia and Bipolar Disorder was prescribed. (R. 225-30.) This was the last entry from the Summit Center.

On January 12, 2009, Jennifer Robinson, M.A., performed a consultative examination on Ms. Ashcraft. (R. 346-49.) Ms. Ashcraft described how her anxiety and bipolar disorder have affected her daily life, including lethargy, mood swings which can be violent, and inability to focus on tasks. Ms. Robinson measured Ms. Ashcraft's social functioning, concentration, pace, and immediate memory to all be within normal limits. (R. 348-49.) Her recent memory was severely deficient. (R. 349.) The diagnosis was bipolar disorder, moderate depression, and anxiety disorder, not otherwise specified. (R. 348.)

---

[1] On these records there are two signatures, one of Mr. Stevens and one of Ms. Watson, later Ms. Benincosa. It appears that Mr. Stevens might just be the supervising signature to the evaluating staff, but the Court will nonetheless use Mr. Steven's name as it does not have an effect on the analysis.

On January 26, 2009, a psychiatric review technique was submitted by Jim Capage, Ph.D., which found that an RFC was necessary based upon Ms. Ashcraft's affective and anxiety related disorders. (R. 354.) Dr. Capage found mild restriction of activities of daily living, and moderate difficulties in both maintaining social functioning and maintaining concentration, persistence, or pace. The doctor did not note any episodes of decompensation, and ultimately found that Ms. Ashcraft did not meet or equal the Listings. (R. 364, 66.) In so finding, the doctor noted that the evidence did support Ms. Ashcraft's statements regarding her mental impairments, but the degree of limitation was not consistent. (R. 366.) Accordingly, the doctor found her not fully credible. (*Id.*) Doctor Capage's functional capacity assessment concluded that Ms. Ashcraft

> retains the mental-emotional capacity to perform routine work-related activities in a low-pressure setting. She can manage infrequent and superficial contact with coworkers and supervisors, but given her penchant for mood swings and irritability, it seems that she would work best in more of a socially-isolated setting that deals with things rather than people.

(R. 370.) This opinion was affirmed as written. (R. 387.)

*2. Physical Health*

Several x-rays of the spine were taken in November 2005 that revealed normal results. (R. 305.) Ms. Ashcraft regularly saw her treating physician , John Manchin, II, D.O., from early 2005 to 2007 for a variety of common illnesses. (R. 276-322.) With regards to Ms. Ashcraft's complaints about back, neck, and shoulder pain, it appears that Dr. Manchin routinely prescribed pain medication. On February 16, 2007, Ms. Ashcraft presented to the emergency room at Ruby Memorial Hospital with abdominal pain, vomiting, constipation alternating with diarrhea, and rectal bleeding. (R. 319.) At that visit, and at a follow up visit a week later, she

was prescribed medication for her stomach problems. (*Id*.) On March 13, 2007, she was seen at the West Virginia University (WVU) Digestive Disease Clinic. (*Id*.) At that appointment, Ms. Ashcraft was advised to continue taking Nexium to relieve her GERD, and avoid certain things that aggravate the problem. (R. 320.) She was also diagnosed with irritable bowel syndrome, and the doctor ordered an EGD to rule out ulcers. (*Id*.) The upper endoscopy was performed on March 23, 2007, and resulted in a finding of antral gastritis and mild bulbar duodenitis. (R. 317.)

In May 2007, Ms. Ashcraft presented to the WVU Department of Orthopedics on referral from the emergency room for complaints of neck and back pain. The doctor's impression was cervicalgia, neck sprain, scoliosis, left rotator cuff syndrome, lumbar sprain, and left cervical radiculopathy. (R. 328.) Ms. Ashcraft was put on an exercise plan, given a prescription patch for her neck and back, and recommended for professional massages. (*Id*.) Further, an MRI of the cervical spine was ordered. (*Id*.) That MRI showed "[v]ery mild degenerative change at the C4-C5 level but no evidence for acute injury to the cervical spine." (R. 330.) An MRI done on her left shoulder, also in May 2007, produced no abnormalities. (R. 332.) In July of 2007, Ms. Ashcraft was offered a cortisone injection in the shoulder, but went with the alternative occupational therapy to see if that helped first. (R. 333.)

For a short period in 2007, Ms. Ashcraft saw Dr. Kevin Clarke who assessed her as being bipolar and having a left rotator cuff tear. (R. 338-340.) Dr. Clarke injected Marcaine into the left shoulder, prescribed several different medications for the bipolar disorder, and referred Ms. Aschcraft to an orthopedist. (*Id*.)Ms. Ashcraft started seeing Dr. Manchin again in early

2008 and continued treatment there for the same complaints thus described. (R. 341-45, 411-423.)

On January 21, 2009, Ms. Ashcraft presented for a consultative examination with Stephen Nutter, M.D. The doctor noticed that Ms. Ashcraft ambulated with a normal gait, did not require any assistive devices, and appeared comfortable at both the seated and supine position. (R. 351.) Further, the doctor noted that both shoulders showed evidence of crepitus, tenderness, and pain with movement. (*Id*.) In sum, the doctor found a "range of motion abnormalities of the cervical and lumbar spine," but all other tests revealed normal results. (R. 353.) The doctor's impression was degenerative arthritis, and chronic cervical and lumbar strain with no evidence of radiculopathy. (*Id*.)

On February 6, 2009, Fulvio Franyutti, M.D., submitted a physical residual capacity assessment, which found that the alleged limitations were partially supported by the findings, making Ms. Ashcraft partially credible herself. (R. 377.) The doctor opined that Ms. Ashcraft could occasionally lift or carry fifty pounds, and frequently lift or carry twenty-five pounds. (R. 373.) Moreover, Ms. Ashcraft could stand, walk, or sit, for about six hours in an eight hour workday, and has unlimited capacity to push or pull. (*Id*.) He further opined that Ms. Ashcraft should only occasionally climb ramps and stairs, or crawl, and that she should never climb ladders, ropes, or scaffolds. (R. 374.) The doctor found no manipulative, visual, or communicative limitations. (R. 375-76.) Finally, the doctor found that Ms. Ashcraft should avoid concentrated exposure to extreme cold or heat, and should avoid concentrated exposure to hazards. (R. 376.) Dr. Franyutti's opinion was affirmed as written. (R. 386.)

Finally, it is noted that Ms. Ashcraft was treated by a chiropractor, George Higgs, D.C. for several months in 2010. During this treatment several tests were done and submitted to

the ALJ measuring levels of muscle tension and thermal asymmetries in the spine. (R. 394-410.) In November 2010, Dr. Higgs sent a letter to social security describing Ms. Ashcraft's scoliosis, and opining that she needs to continue treatment because at that time she had trouble with most activities of daily life. (R. 424.)

## D. Testimonial Evidence

At the outset, the ALJ thoroughly discussed Ms. Ashcraft's right to be represented by an attorney at the hearing, the avenues to obtain an attorney, and what an attorney might be able to help her with. (R. 29-32.) Ms. Ashcraft stated that she fully understood, signed a waiver to be represented, and the hearing proceeded. (R. 33.)

Ms. Ashcraft testified that she spent three years in college, but that she dropped out because of her mental health. (R. 37.) She testified that her past work consisted of running a graphics design shop, waitressing, construction laborer, and storm chasing. (R. 39.) She left her latest job in graphic design because the work overwhelmed her, and she could not take the emotional part of the work. (R. 40.) Ms. Ashcraft stated that she has always had neck and shoulder problems, but the bipolar issues did not come about until she was in school. (R. 41.)

With regard to her physical impairments, Ms. Ashcraft testified that she has a lot of pain, and extreme headaches that make her vomit. (*Id.*) Further, she got to the point where she was losing motion in her shoulder and she was dropping the trays at her waitress job. (*Id.*, 45-46.) She stated that her chiropractor told her that she has discs in her neck that are pinching her brainstem, and that is the reason for her headaches. (R. 42.) For relief, Ms. Ashcraft stated that painkillers do not help, and that lying down helps only sometimes. (R. 44.) She stated that

she can stand or walk for about two hours, and that she can sit continuously for about four hours. (R. 46.)

With regard to her mental health, Ms. Ashcraft stated that her short term memory is bad, and that her thoughts are always racing. (R. 47.) She stated that she gets real nervous and anxious when she is around crowds. (R. 48.) Further, she is not seeing a psychiatrist because her insurance would not cover it and she could not otherwise afford it, but that her general care provider has been prescribing Xanax. (R. 48.) Her typical day involves waking and getting her son to school, tending to his needs as required, and, if not in a depressive mood, cleaning and doing laundry. (R. 51.) If she is depressed she will watch television or take a nap. (*Id*.)

The VE then described Ms. Ashcraft's past relevant work which ranged from light to medium, and unskilled to skilled. (R. 54.) The The ALJ then posed the following hypothetical to the VE:

> Let's assume an individual, a hypothetical individual, who is of the claimant's age, education and work history, who can do medium exertional work, who is limited to occasional climbing of stairs and ropes, I'm sorry, ramps; stairs and ramps–can't read my own writing here–who can occasionally crawl, can never climb ladders, ropes or scaffolds, who needs to avoid concentrated exposure to extreme cold, heat and hazards such as moving machinery and heights.
>
> Who can perform simple tasks consistent with SVP-2 entry-level work; who can make simple work-related decisions with few workplace changes; can have no contact with the public and occasional contact with supervisors and superficial contact with coworkers. Can such a person do the claimant's past work?

(R. 55.) The VE responded that this person could not do Ms. Ashcraft's past work, but that there are a significant number of jobs in the national economy that such a person could perform. (*Id*.) The ALJ then added a limitation for only occasional reaching in all directions,

bilaterally. (R. 56.) The VE responded that this limitation would preclude all the jobs he provided in response to the previous hypothetical. (R. 56-57.) The ALJ changed the hypothetical from reaching in all directions, to occasional overhead reaching, and the VE stated that this limitation would not have a significant impact on any of the jobs provided in response to the original hypothetical. (R. 57.) Finally, the ALJ asked if the original hypothetical person was limited to occasional overhead reaching, was able to do frequent reaching in all directions, and was able to do frequent handling, if that would make a difference. (*Id.*) The ALJ stated that it would have slight impact on the number of some of the jobs, but that it would not preclude those jobs. (*Id.*) The VE testified that the jobs he listed were consistent with descriptions in the Dictionary of Occupational Titles. (R. 59.)

## III. THE MOTIONS FOR SUMMARY JUDGMENT

### A. Contentions of the Parties

Ms. Ashcraft raises several points of error that she believes shows the decision was not based upon substantial evidence: (1) that the ALJ failed to develop the case; (2) that the ALJ failed to resolve conflicting evidence; (3) that the ALJ failed to give appropriate weight to treating sources; and (4) the ALJ submitted an improper hypothetical to the VE. The Commissioner, on the other hand, contends that the ALJ's decision was based on substantial evidence.

### B. The Standards

#### 1. Summary Judgment

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no

genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

### 2. Judicial Review

Only a final determination of the Commissioner may receive judicial review. *See* 42 U.S.C. §405(g), (h); *Adams v. Heckler*, 799 F.2d 131,133 (4th Cir. 1986). Moreover, An ALJ's findings will be upheld if supported by substantial evidence. *See Milburn Colliery Co. v. Hicks*, 138 F.3d 524, 528 (4th Cir. 1998). Substantial evidence is "not a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), but that which a "reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Further, the "possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

### 3. Social Security - Medically Determinable Impairment - Burden.

Ms. Ashcraft bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful

activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); *Heckler v. Campbell*, 461 U.S. 458, 460 (1983).

## C. DISCUSSION

The Court would like to first address an argument that is pervasive throughout Ms. Ashcraft's memorandum in support of summary judgment that the ALJ failed to perform her duties in a heightened sense because Ms. Ashcraft appeared at the hearing *pro se*. It is well-established in the Fourth Circuit that a claimant, appearing *pro se*, is "entitled to the sympathetic assistance of the ALJ to develop the record, to assume a more active role and to adhere to a heightened duty of care and responsibility." *Crider v. Harris*, 624 F.2d 15, 16 (4th Cir.1980) (internal quotation marks and citation omitted). When presented with a pro se claimant, the ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir.1980); *see also Walker v. Harris*, 642 F.2d 712 (4th Cir. 1981). However, an ALJ "is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record." *Bell v. Chater*, 57 F.3d 1065 (4th Cir.1995) (quoting *Clark v. Shalala*, 28 F.3d 828, 830–831 (8th Cir.1994)).

The Court will first note how easily distinguishable the majority of Fourth Circuit cases that support this proposition are. First, in *Walker*, the claimant had only four years of formal education, and the transcript of the nineteen minute hearing "reflect[ed] a barely-coherent, rambling monologue by her concerning, among other things, cats, chickens, unnatural sexual acts sought to be performed on her nephew, the death of her sister, and the removal of her

nephew from her home." 642 F.2d at 714. The Court found that remand was necessary "especially in cases of *uneducated*, pro se claimants and where the absence of counsel appears to *prejudice* a claimant" *Id*. (emphasis added). Next, in *Marsh*, the claimant completed only two months in the first grade and was illiterate. 632 F.2d at 297. Moreover, the ALJ promised the claimant that he would obtain further evidence from a treating physician, but did not follow through on the promise. *Id*. at 299. The Fourth Circuit again found that remand was necessary. *Id*.

Despite the differences, the Court is conscious of the heightened duty of the ALJ in this case and finds that the ALJ did live up to this duty. The hearing in this case lasted well over an hour, and started by the ALJ thoroughly discussing the benefits an attorney could provide. Ms. Ashcraft, who holds one college level degree and was working toward another, insisted on proceeding without an attorney. Moreover, throughout the transcript it is readily apparent that the ALJ was sympathetic to Ms. Ashcraft and completely engaged her in a dialogue to develop all of the facts that Ms. Ashcraft and the ALJ determined were relevant. The ALJ asked Ms. Ashcraft about all of her physical and mental impairments, how all those impairments affected her daily life, and about specific evidence in the record. The ALJ also asked if there was any evidence that was not in the record and assured Ms. Ashcraft that the record would be left open to submit any additional evidence; an assurance the ALJ lived up to. In sum, Ms. Ashcraft's testimony was coherent and relevant, and nothing in it could have indicated to the ALJ that further information needed to be sought out. Finally, even if the ALJ could have done more, as will be discussed fully below, the ALJ's decision was based upon substantial evidence. Thus, no prejudice can be shown.

*1. Developing the Record*

Ms. Ashcraft's first argument is that the ALJ should have sought out more records and opinions than Ms. Ashcraft provided. Although the ALJ has a duty to "explore all relevant facts and inquire into the issues necessary for adequate development of the record, *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir.1986), "[she] is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record." *Bell v. Chater*, 57 F.3d 1065 (4th Cir.1995) (quoting *Clark v. Shalala*, 28 F.3d 828, 830–831 (8th Cir.1994)). Ultimately, Ms. Ashcraft carried the burden of establishing a *prima facie* entitlement to benefits, *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981), and she consequently "bears the risk of nonpersuasion." *Seacrist v. Weinberger*, 538 F.2d 1054, 1057 (4th Cir.1976). *See also Bell*, 57 F.3d 1065; 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require.").

Here, the ALJ had before her a "reasonably complete record," in that it provided a detailed account of Ms. Ashcraft's alleged disabilities, both physical and mental. Moreover, Ms. Ashcraft has failed to point to any specific evidence that would make the ALJ's decision *not* based on substantial evidence. The only thing Ms. Ashcraft notes in her argument is speculation as to what a doctor might say as to treatment she received. Accordingly, the Court finds that the ALJ adequately developed the record, and even left it open for Ms. Ashcraft to submit any additional evidence that she saw fit, which she did.

Ms. Ashcraft also argues that the ALJ misinterpreted a report from Dr. Higgs, her chiropractor, that states Ms. Ashcraft has "trouble with most activities of daily living." The ALJ

found that certain tests performed by Dr. Higgs were not interpreted into functional limitations, and also that he, being a chiropractor, was not an acceptable medical source opinion. The Court finds this argument unpersuasive. Even if Dr. Higgs were to interpret the test results and his treatment of Ms. Ashcraft into limitations on her ability to work, the ALJ would be free to reject them, as she did, as coming from a non-acceptable medical source under the Social Security Act. *See* 20 C.F.R. §§ 404.1513, 416.913; SSR 06-03p; *Lee v. Sullivan*, 945 F.2d 687, 691 (4th Cir. 1991) ("At best [a chiropractor's] assessment can qualify only as a layman's opinion.").

### 2. Resolving Conflicting Evidence

Ms. Ashcraft next argues that evidence from a consultative examination with Dr. Robinson conflicts with evidence from the United Summit Center, which treated Ms. Ashcraft's mental health, and that the ALJ arbitrarily accepted the findings of the consultative examiner over that from the Summit Center. "The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court." *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir.1996). This Court's inquiry goes no further than whether the ALJ's decision to deny benefits in any aspect is based upon substantial evidence, or inconsistent with the law, and the Court may not re-weigh conflicting evidence. *See e.g. Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Thus, if the ALJ's decision to rely on Dr. Robinson's report is based upon substantial evidence, then the Court must not disturb that finding.

Specifically, Ms. Ashcraft argues that the ALJ found, based on Ms. Robinson's report, that she had normal social function, concentration, and could get along with others, and that this is inconsistent with other evidence, primarily that found in the Summit Center reports.

However, the ALJ's own opinion belies Ms. Ashcraft's contention. At Step 3 of the sequential evaluation process the ALJ specifically found that Ms. Ashcraft has mild restrictions in activities of daily living, and moderate difficulties in social functioning, and concentration, persistence, or pace. (R. 15.) Thus, the ALJ did not take Ms. Robinson's report in a vacuum, as she incorporated the limitations as opined by Dr. Capage, who, in turn, considered the evidence from the Summit Center. Moreover, the ALJ considered these limitations in her RFC, which limited Ms. Ashcraft's exposure to simple tasks that do not require much concentration, and to other people. Accordingly, Ms. Ashcraft's argument must fail.

### 3. Weight of Treating Sources

Ms. Ashcraft's argument here again focuses on the treatment she received from the Summit Center, and rests on the contention that the ALJ did not give any indication as to what weight she was affording the Summit Center reports. However, the ALJ did consider the reports from the Summit Center. (R. 13, 23.)[2] Moreover, even though the ALJ did not quantify the weight given to the Summit Center reports, which did not advise of any functional limitations, the facts and diagnoses in those reports are consistent with all of the other record evidence. All the reports from the Summit Center, save the last one, show the same thing; that is, Ms. Ashcraft suffers from depression and anxiety related disorders. All of the reports note that progress was being made through treatment as well, with the exception of the last report that noted a deterioration. All of the presenting symptoms given by Ms. Ashcraft at these appointments were also given to Ms. Robinson, who also had the same diagnostic impressions: bipolar disorder and anxiety related disorder. Finally, all of this evidence was obviously

---

[2] The Court will note that it appears from the record that Ms. Ashcraft was seen by several different professionals while seeking treatment from the Summit Center.

considered by the ALJ when she formulated an RFC that put limitations on things that appeared through the record as stressors to Ms. Ashcraft's conditions. Accordingly, the Court finds the ALJ's decision with regard to the medical sources is based upon substantial evidence.

### 4. The Hypothetical

Ms. Ashcraft contends that the ALJ erred by telling the VE that she could perform SVP-2 entry-level work, and that this proffer precluded the VE from independently considering the limitations in determining whether jobs existed in the national economy. In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record and it must be in response to proper hypothetical questions which fairly set out all of the claimant's impairments. *Walker v. Bowen*, 889 F.2d 47, 50-51 (4th Cir. 1989). The ALJ is afforded "great latitude in posing hypothetical questions," and need only pose those that are based on substantial evidence and accurately reflect the plaintiff's limitations. *Koonce v. Apfel*, 166 F.3d 1209 (4th Cir. 1999) (citing *Martinez v. Heckler*, 807 F.2d 771, 774 (9th Cir. 1988)). "The purpose of bringing in a vocation expert is to assist the ALJ in determining whether there is work available in the national economy which the particular claimant can perform." *Cline v. Chater*, No. 95-2076, 1996 U.S. Dist. LEXIS 8692, at *4 (4th Cir. Apr. 19, 1996). "[R]equiring the testimony of a vocational expert is discretionary." *Hall v. Harris*, 658 F.2d 260, 267 (4th Cir. 1981).

ALJ Beers posed to the VE a hypothetical that included, among others, a limitation that the hypothetical person "can perform simple tasks *consistent* with SVP-2 entry-level work." (R. 55.) (emphasis added). As mentioned, a hypothetical posed by an ALJ is flawed only if it does not include all of the limitations found by the ALJ. *See Walker, supra*; *Johnson v. Barnhart*, 434

F.3d 650, 659 (4th Cir. 2005). Here, the ALJ did set forth all of the limitations; in this instance Ms. Ashcraft being limited to performing simple tasks. The ALJ did not direct the VE to find that Ms. Ashcraft could perform jobs. The inclusion of a specific vocational preparation (SVP) level did nothing more than illustrate for the VE what an amorphous term like "simple tasks" is consistent with so the VE could provide an accurate representation of any jobs in the regional and national economy that fit that limitation, in combination with the many other limitations in the ALJ's hypothetical. Accordingly, the Court finds no error with the hypothetical.

## IV.  RECOMMENDATION

The Court finds that the ALJ performed the heightened duty required when a claimant appears unrepresented, and fully developed the case as she was required. Moreover, there was little to no conflicting evidence in the record which warrants further consideration by the ALJ. Finally, there was nothing improper about the hypothetical posed to the vocational expert. Accordingly, the Court finds that the ALJ's decision was based upon substantial evidence and **RECOMMENDS THAT**:

1.     Ms. Ashcraft's Motion for Summary Judgment be **DENIED**.

2.     Commissioner's Motion for Summary Judgment be **GRANTED** for the reasons set forth.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and

Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: March 12, 2013                    /s/ James E. Seibert
                                                    JAMES E. SEIBERT
                                                    UNITED STATES MAGISTRATE JUDGE