**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**


**AMY C. ASHCRAFT,**

      Plaintiff,

**v.**                                   **CIVIL ACTION NO. 3:12-CV-113
(JUDGE GROH)**

**CAROLYN W. COLVIN,
ACTING COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.


**MEMORANDUM OPINION AND ORDER ADOPTING REPORT AND
RECOMMENDATION AND OVERRULING OBJECTIONS**

      Plaintiff, Amy C. Ashcraft, filed an action in this Court on September 26, 2012,

seeking judicial review of an adverse decision by the defendant, Commissioner of Social

Security, pursuant to 42 U.S.C. § 405(g).   The case was referred to United States

Magistrate Judge James E. Seibert for submission of proposed findings of fact and

recommendation for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(A) and 636(b)(1)(B).

Defendant filed an answer to Plaintiff's Complaint on December 17, 2012.  Plaintiff filed a

motion for summary judgment on January 11, 2013.   Defendant filed its motion for

summary judgment on February 11, 2013.

      On March 12, 2013, Judge Seibert filed his report and recommendation for

disposition.  The Report and Recommendation stated that if the parties objected to any

portion of his proposed findings of fact and recommendation for disposition, they must file

written objections within fourteen days after being served with a copy of the Report and

Recommendation. On March 22, 2013, Plaintiff filed her written objections to the Report and Recommendation.

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court is required to make a *de novo* review of those portions of the magistrate judge's findings to which objection is made. However, failure to file objections permits the district court to review the Report and Recommendation under the standard that the district court believes are appropriate, and under these circumstances, the parties' right to *de novo* review is waived. *See **Webb v. Califano***, 468 F. Supp. 825 (E.D. Cal. 1979). Therefore, this Court will conduct a *de novo* review only as to those portions of the Report and Recommendation to which Plaintiff objected. The remaining portions of the Report and Recommendation will be reviewed for clear error.

### I.     Background

### A. Procedural History

In October 2008, Plaintiff filed an application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Plaintiff claimed she was disabled since September 2, 2007 due to anxiety, bipolar disorder, and neck and shoulder problems. R. at 143. Plaintiff's applications were initially denied on February 9, 2009 and upon reconsideration April 13, 2009. R. at 11. On June 17, 2009, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). *Id.* On November 2, 2010, the ALJ held the hearing, and Plaintiff signed a waiver of her right to be represented by counsel and proceeded to testify at the hearing. *Id.* Also, Dwight McMillion, an impartial Vocational Expert ("VE"), appeared at the hearing. *Id.*

On January 5, 2011, the ALJ issued her decision finding that Plaintiff was not disabled. Plaintiff appealed the decision to the Appeals Council, which denied review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. Then, Plaintiff filed this action.

**B. Factual Background**

*1. Personal History*

Plaintiff was born in 1978. She is married, and she has one son from a previous marriage. She graduated high school, completed a two year vocational program where she received an early childhood education degree, and completed three years at Fairmont State University towards a degree in graphic design. R. at 39, 150-51. In the past fifteen years, she worked as a graphic designer, waitress, construction laborer, and storm chaser. R. at 39. She also previously volunteered at her church, helping with vacation Bible school every year. R. at 40. Plaintiff stated she became disabled on September 2, 2007. R. at 41.

*2. Mental Health Medical History*

Plaintiff was initially given Xanax by her treating doctor to help with her nerves. R. at 260. However, in November 2005, she was referred to a psychiatrist. *Id.* Claimant had five appointments with the United Summit Center, a behavioral health center, from January 2006 to January 2007. On January 27, 2006, in her initial psychiatric intake evaluation, performed by Richard Cook, PAC, she complained of "racing thoughts, irritability, and poor sleep" that interfered with her college courses. R. at 260. Plaintiff reported a history of panic attacks and depression. *Id.* Dr. Cook's impression was that Plaintiff suffered from Mood Disorder NOS and untreated general anxiety disorder and

mood disorder.  *Id.*

On March 27, 2006, Plaintiff had a 90-day follow up appointment at the United Summit Center.  John Stevens, M.A., reported that Plaintiff has "made some progress" and that "her mood has improved." R. at 255.  At this point, Plaintiff seemed to be doing well in therapy, although she still had difficulty sleeping and concentration problems.  *Id.*

At the 180-day follow up appointment on June 22, 2006, Mr. Stevens stated that Plaintiff had "made some progress, her mood has improved and her panic attacks have decreased to mild."  R. at 246.  Plaintiff reported that the medicine prescribed by the United Summit Center helped her think more clearly, but that she still had difficulty sleeping, relaxing, and concentrating.  *Id.*

On October 11, 2006, Plaintiff had a 270-day follow up appointment.  R. at 239. It was reported that she had made some progress in the past 90 days.  Her anxiety and withdrawal decreased to moderate. *Id.*  However, she still had occasional panic attacks. *Id.*  Mr. Stevens noted that although her mood seemed a bit depressed, her thought process was logical and coherent and her thought content was organized. *Id.*

The last report from the United Summit Center is dated January 12, 2007.  R. at 225.  The report noted that Plaintiff's condition had deteriorated, and further treatment for her diagnosed Panic Disorder without Agoraphobia and Bipolar Disorder was prescribed. R. at 225-30.

Jennifer Robinson, M.A., conducted a consultative examination of Plaintiff on January 12, 2009.  R. at 346.  Ms. Robinson described how Plaintiff's bipolar disorder and anxiety affected her daily life, including lethargy, mood swings, and inability to focus on tasks.  Ms. Robinson noted that Plaintiff "displayed good hygiene and grooming,"

and had good eye contact and fair insight.  R. at 348.  Ms. Robinson noted that

Plaintiff's immediate memory, remote memory, and concentration were within normal

limits.  *Id.*  However, her recent memory was severely deficient.  *Id.*  Ms. Robinson's

diagnosis was bipolar disorder, moderate depression, and anxiety disorder, not

otherwise specified. *Id.*

On January 26, 2009, state agency mental health expert Jim Capage, Ph.D.,

reviewed the record and completed a psychiatric review technique form (PRTF) and

mental residual functional capacity (RFC) assessment.   R. at 354.  Dr. Capage found

mild restriction of activities of daily living and moderate difficulties in both maintaining

social functioning and maintaining concentration, persistence, or pace.  R. at 364.  Dr.

Capage found no episodes of decompensation. *Id.*  Dr. Capage noted that the evidence

supported Plaintiff's statements regarding her mental impairments, but not the degree of

limitation.  R. at 366.  Thus, Dr. Capage found Plaintiff not fully credible.  *Id.*

Dr. Capage's RFC concluded that Plaintiff was not markedly limited in any of the

four categories: understanding and memory; sustained concentration and persistence;

social interaction; and adaptation.  R. at 368-69.  Dr. Capage summarized his findings

as follows:

> [Plaintiff's] mental impairments are severe but do not meet nor equal the
> Listings [of Impairments].  Ratings of Part I of this Form indicate that the
> [Plaintiff] retains the mental-emotional capacity to perform routine work-
> related activities in a low-pressure setting.  She can manage infrequent
> and superficial contact with coworkers and supervisors, but given her
> penchant for mood swings and irritability, it seems that she would work
> best in more of a socially-isolated setting that deals with things rather than
> people.

R. at 370.

3.    *Physical Health History*

In November 2005, several x-rays of Plaintiff's spine were taken that revealed normal results.  R. at 305.  Between 2005 to 2007, Plaintiff regularly saw her treating physician, John Manchin, II, D.O. R. at 276-322.  In her visits to Dr. Manchin, Plaintiff complained about back, neck, and shoulder pain.  Dr. Manchin treated Plaintiff with pain medication.  On February 16, 2007, Plaintiff went to the emergency room at Ruby Memorial Hospital complaining of abdominal pain. R. at 262.  She also reported having nausea, vomiting, diarrhea, constipation, and bloody stool.  R. at 263.  She was prescribed medication for her symptoms.  R. at 319.  On February 23, 2007, Plaintiff visited Dr. Palmer.  He prescribed medication to help with the nausea and vomiting.

On March 13, 2007, Plaintiff went to the West Virginia University Digestive Disease Clinic.  R. at 319.  The doctor recommended that Plaintiff continuing taking Nexium to relieve her gastrointestinal symptoms.  R. at 320-21.  Plaintiff was diagnosed with irritable bowel syndrome, and the doctor ordered an EGD to rule out peptic ulcer disease.  R. at 321.  On March 23, 2007, an upper endoscopy was performed, and the procedure revealed antral gastritis and mild bulbar duodenitis. R. at 317.

On May 1, 2007, Plaintiff visited the West Virginia University Department of Orthopaedics, on referral from the West Virginia University Emergency Department. R. at 326.  Plaintiff complained of a neck pain in her left side radiating into her shoulder.  R. at 328.  The doctor's impression was cervicalgia, neck sprain, scoliosis, left rotator cuff syndrome, lumbar sprain, and left cervical radiculopathy.  *Id.*  Plaintiff was put on an exercise plan, including a walking program, given a prescription patch for her neck and back, and recommended for professional massages once a week for eight weeks.  *Id.*

The doctor also ordered an MRI of the cervical spine. *Id.* The MRI revealed "[v]ery mild degenerative change at the C4-C5 level but no evidence for acute injury to the cervical spine." R. at 330. Also in May 2007, a MRI completed on her left shoulder produced no abnormalities. R. at 332. In July 2007, Dr. Matthew P. Darmelio offered to treat Plaintiff's shoulder and neck pain with a cortisone injection, however he decided to first treat with alternative occupational therapy. R. at 333.

In 2007, Plaintiff also saw Dr. Kevin Clarke. R. at 338-340. Dr. Clarke assessed Plaintiff as being bipolar and having a left rotator cuff tear. *Id.* Plaintiff was treated with a Marcaine injection to her left shoulder. Dr. Clarke also prescribed several different medications for Plaintiff's bipolar disorder and referred her to an orthopedist. *Id.*

In 2008, Plaintiff returned to Dr. Manchin's office and continued treatment for the same issues described earlier. R. at 341-45, 411-423.

On January 21, 2009, Plaintiff had a consultative examination with Stephen Nutter, M.D. Doctor Nutter noted that Plaintiff had a normal gait, did not require a handheld assistive device, appeared stable at station and comfortable in the supine and sitting position, and had normal intellectual functioning. R. at 351. He also noted that her recent and remote memory for medical events was good. *Id.* Doctor Nutter noted that Plaintiff's right shoulder showed signs of crepitus, mild tenderness and pain with movement and her left shoulder showed evidence of crepitus, moderate tenderness and pain with movement. R. at 352. The doctor did not notice any other redness, warmth, swelling, tenderness, crepitus or laxity in the upper extremity joints. *Id.* Doctor Nutter's impression was Plaintiff had degenerative arthritis and chronic cervical and lumbar strain with no evidence of radiculopathy. R. at 353. Doctor Nutter concluded that

Plaintiff had a range of motion abnormalities of the cervical and lumbar spine, however, her straight leg raise test was negative, she had no sensory abnormalities, and her reflexes and muscle strength testing was normal. *Id.*

On February 6, 2009, Fulvio Franyutti, M.D. submitted a physical residual capacity assessment, finding that Plaintiff's alleged limitations were *partially* supported by findings. R. at 377. Therefore, Doctor Franyutti considered Plaintiff only partially credible. *Id.* Dr. Franyutti found that Plaintiff could occasionally lift or carry fifty pounds and frequently lift or carry twenty-five pounds. R. at 373. Also, Plaintiff could stand, walk, or sit for about six hours in an eight hour workday and had unlimited capacity to push or pull. *Id.* Dr. Franyutti also noted that Plaintiff should only occasionally climb ramps and stairs or crawl and she should never climb ladders, ropes, or scaffolds. R. at 374. Dr. Franyutti found no manipulative, visual, or communicative limitations. R. at 375-76. Last, Dr. Franyutti found that Plaintiff should avoid concentrated exposure to extreme cold or heat and should avoid concentrated exposure to hazards (machinery, heights, etc.). R. at 376.

In 2010, Plaintiff was also treated by chiropractor George Higgs, D.C. R. at 394-410. Dr. Higgs completed several tests measuring levels of muscle tension and thermal asymmetries in the spine. *Id.* The test results were submitted to the ALJ. In November 2010, Dr. Higgs sent a letter to social security describing Plaintiff's scoliosis and stating she needs to continue treatment because at that time, she had trouble with most activities of daily life. R. at 424.

*4. Evidence from Hearing with ALJ*

On November 2, 2010, ALJ Caroline Beers held a hearing regarding Plaintiff's

claim for disability.  R. at 26.  At the beginning of the hearing, the ALJ thoroughly

explained to Plaintiff, and Plaintiff recognized, that she had a right to be represented by

counsel. R. at 29-33.  The ALJ explained that:

> Social Security is a very specialized area of the law, and so an individual
> who is knowledgeable, if they're an attorney or a qualified representative,
> can usually present–present a better case for you than you can on your
> own, not that you can't do it on your own, of course.

R. at 30.  The ALJ went on to explain that attorneys are paid through a contingency fee,

"[m]eaning, that unless they win the case for you, that they don't get paid." *Id.*  Also, the

ALJ elaborated that Plaintiff could find an attorney from Legal Aid that would provide

either free or reduced rates for representation.  *Id.*  Plaintiff acknowledged that she fully

understood her right to be represented by an attorney at the hearing.  R. at 33.  Then,

Plaintiff signed a waiver to be represented, and the ALJ proceeded with the hearing.  *Id.*

Plaintiff testified that she studied graphic design for three years in college, but

that she dropped out because of her mental health problems.  R. at 37.  Plaintiff testified

that her past work consisted of running a graphic design shop, waitressing, construction

laborer, and storm chasing.  R. at 39.  Plaintiff stated she left her graphic design job

because she was having difficulty controlling her emotions and would get overwhelmed.

R. at 40.  Plaintiff explained that she developed her bipolar issues when she was in

school, but she always had neck and shoulder problems.  R. at 41.

With regard to her physical health, Plaintiff testified that she has pain in her

shoulders and neck.  R. at 42.  The ALJ asked Plaintiff what aggravates her neck pain,

and Plaintiff stated that "pretty much anything" makes it worse.  R. at 43.  Plaintiff stated

she has moderate to severe pain, and she feels that she has a tear in her left arm, but

the MRI does not reveal one.  R. at 45.

With regard to her mental health, Plaintiff testified that she is bipolar and she has racing thoughts.  R. at 47.  However, when she watches television shows, she is able to follow the story line and remember what happened "[f]or a little while." R. at 48.  She is nervous or anxious in front of crowds or when she is the center of attention.  *Id.* Although she is not seeing a psychiatrist, she receives Xanax from her regular care provider.  *Id.*

With regard to her daily activities, Plaintiff is able to take care of her personal needs and hygiene.  R. at 49.  She cooks, cleans, and does the laundry for the household.  R. at 49, 51.  She tries to attend her son's school functions, and she usually takes him to baseball practices and to the school bus stop.  R. at 50.  She also helps her son with his homework when she can.  R. at 51.  Plaintiff is able to use a computer. *Id.*  Plaintiff also takes care of her pets, visits with family, watches television shows, reads, and does craft activities, like beading.  R. at 52-53

Next, the VE described Plaintiff's past relevant work, ranging from light to medium and unskilled to skilled. R. at 54.  Then, the ALJ posed the following hypothetical to the VE:

> Let's assume an individual, a hypothetical individual, who is of the claimant's age, education and work history, who can do medium exertional work, who is limited to occasional climbing of stairs and ropes, I'm sorry, ramps; stairs and ramps–can't read my own writing here–who can occasionally crawl, can never climb ladders, ropes or scaffolds, who needs to avoid concentrated exposure to extreme cold, heat and hazards such as moving machinery and heights.
>
> Who can perform simple tasks consistent with SVP-2 entry-level work; who can make simple work-related decisions with few workplace changes; can have no contact with the public and occasional contact with

supervisors and superficial contact with coworkers.  Can such a person do the claimant's past work?

R. at 55.  The VE responded that this hypothetical person could not do Plaintiff's past work, but there were a significant number of jobs in the national economy that such a person could perform. *Id.*  Then, the ALJ added a limitation for occasional reaching in all directions, bilaterally. R. at 56. The VE answered that this limitation precluded all the jobs he provided in response to the previous hypothetical.  R. at 56-57.  Next, the ALJ changed the hypothetical from reaching in all directions, to occasional overhead reaching.  R. at 57.  The VE responded that the limitation did not have a significant impact on any of the jobs provided in response to the original hypothetical.  *Id.*  Last, the ALJ asked if the original hypothetical person was limited to occasional overhead reaching, was able to do frequent reaching in all directions, and was able to do frequent handling, if that would make a difference. *Id.*  The ALJ stated that it would have a slight impact on the number of some jobs, but that it would not preclude those jobs. *Id.*  Last, the VE testified that the jobs he listed were consistent with descriptions in the Dictionary of Occupational Titles. R. at 59.

## II.      Applicable Standards

### A.      Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment. *See* Fed. R. Civ. P. 56.  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." ***Celotex Corp. v. Catrett***, 477 U.S. 317, 322,

106 S. Ct. 2548, 2552 (1986).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). Thus, the Court must conduct "the threshold inquiry of determining whether there is the need for a trial- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  ***Anderson***, 477 U.S. at 250, 106 S. Ct. at 2511.

The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts."  ***Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.***, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). That is, once the movant has met its burden to show an absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial.  FED. R. CIV. P. 56(c); ***Celotex Corp.***, 477 U.S. at 323-25, 166 S. Ct. at 2552-54; ***Anderson***, 477 U.S. at 248, 106 S. Ct. at 2510.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  ***Anderson***, 477 U.S. at 249, 106 S. Ct. at 2511 (citations omitted).

B.      **Judicial Review of an ALJ Decision**

"Judicial review of a final decision regarding disability benefits is limited to determining whether the findings . . . are supported by substantial evidence and whether the correct law was applied.  *See* **42 U.S.C. § 405(g)**.  'The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive.' ***Richard v. Perales***,

402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); **Coffman v. Bowen**, 829 F.2d 514, 517 (4th Cir. 1987).  The phrase 'supported by substantial evidence' means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' *See* **Perales**, 402 U.S. at 401, 91 S. Ct. at 1427 (citing **Consolidated Edison Co. v. NLRB**, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938)). . . . [Substantial] evidence] consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance . . . . Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment . . . if [the] decision is supported by substantial evidence.  *See* **Laws v. Celebrezze**, 368 F.2d 640, 642 (4th Cir. 1966); **Snyder v. Ribicoff**, 307 F.2d 518, 529 (4th Cir. 1962). Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence.  **King v. Califano**, 599 F.2d 597, 599 (4th Cir. 1979). ('This Court does not find facts or try the case *de novo* when reviewing disability determinations.') **Seacrist v. Weinberger**, 528 F.2d 1054, 1056-57 (4th Cir. 1976)." **Hays v. Sullivan**, 907 F.2d 1453, 1456 (4th Cir. 1990).

### C.    Social Security - Medically Determinable Impairment- Burden

Plaintiff bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  **42 U.S.C. § 423(d)(1)**, **(d)(2)(A)**; **Heckler v. Campbell**, 461 U.S. 458, 469 (1983).

## III.    Discussion

Plaintiff has three primary objections: (1) the ALJ did not perform his heightened duty to the *pro se* Claimant/Plaintiff,[1] (2) the ALJ failed to develop the record, and (3) the ALJ posed an improper hypothetical to the VE.

### A.    The ALJ's Heightened Duty to the *Pro Se* Claimant/Plaintiff

In the Fourth Circuit, a claimant, appearing *pro se*, is "entitled to the sympathetic assistance of the ALJ to develop the record, to assume a more active role and to adhere to a heightened duty of care and responsibility." ***Crider v. Harris***, 624 F.2d 15, 16 (4th Cir. 1980) (internal quotation marks and citation omitted).  When a claimant represents herself *pro se*, the ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." ***Marsh v. Harris***, 632 F.2d 296, 299 (4th Cir. 1980) (internal quotation marks and citations omitted).  If the ALJ's failure to do so results in less than a "full and fair hearing of their claims," then "good cause" may exist to remand "for the taking of additional evidence." ***Sims v. Harris***, 631 F.2d 26, 27 (4th Cir. 1980).  However, when a claimant waives her right to be represented by counsel, "the Secretary has no duty to insist that claimant have counsel." ***Marsh***, 632 F.2d at 299.

"[C]ourts of appeals have found good cause to remand where the administrative law judge fails diligently to explore all relevant facts *especially in cases of uneducated, pro se claimants* and where the absence of counsel appears to prejudice a claimant."

---

[1]For purposes of this Order, Ms. Ashcraft is referred to as the Plaintiff rather than as the Claimant.

*Walker v. Harris*, 642 F.2d 712, 714 (4th Cir. 1981). In *Walker*, the claimant was a 54 year old woman with a fourth-grade education. *Id.* at 713. She appeared unrepresented at the hearing, which lasted only nineteen minutes. *Id.* at 714. Claimant called no witnesses, and "[t]he transcript reflects a barely-coherent, rambling monologue by her concerning, among other things, cats, chickens, unnatural sexual acts sought to be performed on her nephew, the death of her sister, and the removal of her nephew from her home. The administrative law judge made no effort to focus her testimony on relevant matters." *Id.* Therefore, the Fourth Circuit had "no difficulty concluding that the administrative law judge failed in her duty 'scrupulously and conscientiously (to) probe into, inquire of, and explore for all the relevant facts' in this case involving an unrepresented, poorly-educated pro se claimant." *Id.*

In *Marsh*, the *pro se* claimant was illiterate and completed only two months of the first grade. 632 F.2d at 297. The Court found that the claimant had an "obvious lack of understanding of the evidence necessary to develop the critical issues" and this problem was compounded by the absence of an attorney. *Id.* at 300. The Court explained that the claimant's "testimony provided sketchy evidence concerning nocturnal episodes resulting from his epileptic condition, he was completely unaware of any necessity for a recent EEG, and he furnished incomplete information about his ability to perform household chores, the number and frequency of the attacks, and the effects of his medication." *Id.* at 299. Therefore, the ALJ had a duty to fully inquire into the issues necessary for adequate development of the record, such as evidence necessary to prove claimant's epileptic disability, and he failed to do so. *Id.* at 299-300.

Accordingly, the case was remanded for further development of the record. *Id.* at 300.

Upon review of the hearing transcript in this case, it is apparent that the ALJ "scrupulously and conscientiously prob[ed] into, inquir[ed] of, and explore[d] [] all the relevant facts . . . ." *See id.* at 299. First, unlike the nineteen minute hearing in *Walker*, Plaintiff's hearing lasted over an hour. Plaintiff is an educated *pro se* claimant with three years of college education–this far surpasses the claimant's four years of education in *Walker* and the claimant's two months of first grade in *Marsh*. In 2007, Plaintiff was pursuing a degree in graphic design. She was able to read, write, and do math. Plaintiff also received a two year degree in early childhood education.

Second, the ALJ thoroughly explained to Plaintiff, and Plaintiff recognized, that she had a right to an attorney. The ALJ explained that:

> Social Security is a very specialized area of the law, and so an individual who is knowledgeable, if they're an attorney or a qualified representative, can usually present–present a better case for you than you can on your own, not that you can't do it on your own, of course.

The ALJ went on to explain that attorneys are paid through a contingency fee. Also, she elaborated that Plaintiff could find an attorney from Legal Aid that would provide either free or reduced rates for representation. Thus, Plaintiff had a clear understanding that she had a right to an attorney and what her options were for finding such representation. However, Plaintiff elected to proceed and signed a form indicating that she waived her right to be represented by counsel.

Third, the ALJ also told Plaintiff that if she was lacking certain medical records, the ALJ could make the request for the documents or hold the record open for Plaintiff to file the records. Plaintiff stated on the record that she was missing files from Dr.

Higgs, her chiropractor. Therefore, the ALJ held the record open for Plaintiff to submit the medical records from Dr. Higgs office, which she did submit and were included in her file. R. at 424. Also, Plaintiff filed medical records from Dr. John Manchin at the Manchin Clinic after the hearing for the ALJ to review in making her decision. R. at 415.

Fourth, the ALJ explained on the record in plain language terms–not legalese–the issue for her to determine and Plaintiff's burden. Therefore, the ALJ satisfied her heightened duty to the *pro se* Claimant, and Plaintiff's objection is **OVERRULED**.

### B. Developing the Record

#### 1. Specific Evidence

Judge Seibert stated in his Report and Recommendation that Plaintiff "failed to point to any specific evidence that would make the ALJ's decision *not* based on substantial evidence." However, Plaintiff argues that the ALJ's decision is not based on substantial evidence because she "cherry-picked" facts from Plaintiff's medical records, specifically Exhibit 1F, that were only unfavorable to Plaintiff rather than favorable. Thus, Plaintiff contends that the "ALJ was acting in an adversarial way by only advocating that the cherry-picked evidence points to a non-disability."

Although the ALJ ultimately rendered an unfavorable decision, it does not follow that the ALJ relied only on unfavorable facts. The ALJ stated that she carefully considered all the evidence in rendering her opinion, and she attached a list of all the exhibits in the matter with her decision. R. at 12, 21-25. Additionally, the ALJ specifically cited to twenty-one exhibits to support her decision. Plaintiff argues the ALJ

used only unfavorable facts to the Plaintiff in making her decision.  However, a look at the ALJ's decision shows otherwise. First, the ALJ relied on Plaintiff's medical records to establish that she had "antral gastritis and mild bulbar duodenitis," was depressed, and suffered from bipolar and anxiety disorder. R. at 13-14.  Additionally, in a physical examination performed by Dr. Stephen Nutter, Plaintiff's right shoulder "showed evidence of crepitus, mild tenderness, and pain with movement" and the left shoulder "showed evidence of crepitus, moderate tenderness, and pain with movement." R. at 14.  The ALJ also noted in her decision that Plaintiff's  "[i]nsight was fair, and her judgment skills were markedly deficient.  Recent memory was severely deficient." *Id.* The ALJ did not cherry-pick only unfavorable facts to use in her decision, as evidenced by the numerous favorable facts cited by the ALJ.  However, in weighing the evidence, the ALJ determined that Plaintiff was not disabled because she could perform jobs that exist in significant numbers in the national and regional economy.

### 2.  Speculative Evidence

Plaintiff objects to Judge Seibert's contention that she pointed to "merely speculative evidence concerning what her doctor will say regarding her mental health treatment."  Plaintiff argues that speculative evidence is enough to get a remand, relying on *Sims v. Harris*.

The ALJ has a heightened duty to ensure the claimant receives a full and fair hearing as guaranteed by 20 C.F.R. §§ 404.927, 416.1441. *See Sims*, 631 F.2d at 27. In *Sims*, the ALJ took "seven pages of transcript to establish claimant's name, age, and address for the record." *Id.* at 28.  Also, the claimant "was confused about how to object

18

to the medical evidence in her file and nearly all of her own testimony concerning her medical problems was directionless and generally incoherent." *Id.* Additionally, the ALJ was "unfamiliar with claimant's former job duties and medical ailments, and [the ALJ's] inquiries failed to establish the nature of either with any specificity." *Id.* The Fourth Circuit Court of Appeals found that the "absence of counsel created clear prejudice or unfairness to the claimant." *Id.* Therefore, the Fourth Circuit remanded the case for further fact development including "I.Q. testing, psychological examination, the possibility of heredity in her daughter's medical condition, claimant's work experience and daily lifestyle, and other medical evidence." *Id.*

In this case, the ALJ elicited detailed testimony about Plaintiff's pain and its limitations on her lifestyle and work-related abilities. Unlike the laimant in ***Sims***, Plaintiff in this case answered questions coherently and logically. Plaintiff testified at the hearing that she could stand and walk around two hours a day and that she could sit four continuous hours before she had to move around. R. at 46. Also, she could pick up coins with both hands, turn doorknobs, and reach overhead. R. at 46-47. The ALJ asked Plaintiff to rate her pain on a scale of 1 to 10 and to explain to her where Plaintiff felt the pain. The ALJ inquired into Plaintiff's daily activities, and Plaintiff testified that she got her son ready for school and occasionally took him to baseball practice, watched television, read, took care of her pets, maintained her personal hygiene, prepared simple meals, cleaned the house, did laundry, shopped, drove, did crafts, and visited with friends and family.

The ALJ asked specific questions regarding Plaintiff's previous employment, and it is apparent that the ALJ was familiar with Plaintiff's work history and medical records.

Additionally, the ALJ asked additional questions of the VE, as counsel might have done on behalf of Plaintiff if they had been present, such as by imposing additional hypothetical limitations regarding Plaintiff's ability to reach overhead and bilaterally.

### C.  Dr. Higgs Report

Plaintiff argues that the ALJ erred in failing to develop the record in regards to Dr. Higgs', Plaintiff's chiropractor's, report.  The ALJ discounted Dr. Higgs' report because it was from a non-acceptable medical source and his report failed to interpret Plaintiff's problems into functional limitations.  Plaintiff argues that the ALJ failed to adequately develop the record by discounting Dr. Higgs' report because it failed to state Plaintiff's functional limitations.

The ALJ did not fail to adequately develop the record.  The ALJ kept the record open after the hearing so Plaintiff could submit the opinion letter and records from her chiropractor, Dr. Higgs.  Also, the ALJ properly afforded Dr. Higgs' opinion little weight as he was not an acceptable medical source.  *See* **20 C.F.R. §§ 404.1513(a), (e), 416.913(a), (e)**.  Accordingly, Plaintiff's objection is **OVERRULED**.

### D.  Resolving Conflicting Evidence and Weighing Opinion of Treating Sources

Plaintiff contends the ALJ incorrectly resolved conflicting evidence as the ALJ discounted Plaintiff as not credible because her treating source evidence was inconsistent with the consultative evidence.  Additionally, Plaintiff argues the ALJ incorrectly relied on Dr. Capage's report, a consultative examiner, as the standard by which Plaintiff's problems would be measured. Plaintiff states the ALJ's decision cannot be based on substantial evidence because she failed to weigh evidence in the record

from Plaintiff's treating sources.

This Court's review of Plaintiff's denial of SSI benefits is limited to a determination of whether the decision was supported by substantial evidence. **42 U.S.C. § 405(g)**; *see **Russell v. Barnhart***, 58 Fed. Appx. 25, 27 (4th Cir. 2003). An ALJ's decision is based on substantial evidence if it is supported by "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" ***Richardson v. Perales***, 402 U.S. 389, 401, 91 S. Ct. 1420, (1971) (quoting ***Consolidated Edison Co. v. NLRB***, 305 U.S. 197, 229, 59 S. Ct. 206 (1938)). It "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." ***Laws v. Celebrezze***, 368 F.2d 640, 642 (4th Cir. 1966). "'In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment . . . .'" ***Russell***, 58 Fed. Appx. at 23 (citing ***Craig v. Chater***, 76 F.3d 585, 589 (4th Cir. 1996)). Therefore, the Court will not disturb the ALJ's decision regarding the conflicting evidence so long as it is based on substantial evidence.

First, Plaintiff argues that the ALJ did not sufficiently weigh the United Summit Center's report because the ALJ relied only on unfavorable information. As an initial matter, the Court notes that the 2006 records from the United Summit Center on which Plaintiff relies falls outside the period relevant in this case. Notwithstanding, the ALJ's decision cited to Exhibit 1F, the medical records from the United Summit Center, indicating that she indeed reviewed the records. The ALJ noted that "[w]hile in mental health treatment in 2006, [Plaintiff] was doing well in therapy, and her mood was

improved." R. at 13.  This conclusion is supported by substantial evidence.  The March

24, 2006 review assessment stated that "[Plaintiff] is seeking treatment for anxiety.  She

has made some progress, her mood has improved.  Her agitation has decreased to

moderate.  She is doing well in therapy."  R. at 259.  The June 22, 2006 assessment

from the United Summit Center stated that "[Plaintiff] is seeking treatment for her

anxiety.  She has made some progress, her mood has improved and her panic attacks

have decreased to mild . . . ." R. at 246.  In the October 11, 2006 review assessment,

the United Summit Center reported that

> [Plaintiff] has made some progress in the past 90 days, her withdraw[al]
> decreased to moderate.  She isn't as anxious to go to class.  She hasn't
> had any impulsive behaviors or poor judgment.  Her anxiety decreased to
> moderate.  Her feelings of hopelessness has decreased to mild.  She still
> has panic attacks occasionally.  She still gets agitated easily and is tired
> almost all the time.  She has severe trouble sleeping.  She doesn't want to
> take a sleeping pill because she is afraid she won't be able to wake for her
> son if he need[s] her. . . .
>
> She was tired, but oriented x4.  She was groomed and dressed
> appropriately.  She is easily distracted.  Her psychomotor re[flexes] were
> normal.  Her speech was goal directed and appropriate.  It was a normal
> [volume] and flow[.] Her thought content was organized.  Her mood
> seemed a bit depressed.  Her thought process was logical and coherent.
> She has no hallucinations or delusions.

R. at 239.  Therefore, the ALJ's finding that "[w]hile in mental health treatment in 2006,

[Plaintiff] was doing well in therapy, and her mood was improved" is based on

substantial evidence.  Although in January 2007, the last report from the United Summit

Center stated that Plaintiff reported having an increase in panic attacks and her

depression had increased to moderate and her anxiety had decreased to severe,

Plaintiff had only one report out of five where she was not making progress with her

anxiety and depression. R. at 225.  Also, all of the 2006 reports indicated that Plaintiff

22

was doing well in therapy.  Therefore, the ALJ's conclusion is supported by relevant evidence in the record that a reasonable mind might accept as adequate to support her conclusion.  Additionally, the evidence supporting the ALJ's finding is more than a mere scintilla of evidence.  Although Plaintiff's evaluators at the United Summit Center noted that Plaintiff was easily distracted, they also noted that her thought content was organized and her thought process was logical and coherent.  Thus, although there may be some conflicting evidence, it was the province of the ALJ to weigh the conflicting evidence and make credibility determinations, and this Court will not substitute its judgment for that of the ALJ in regards to such matters.

Second, Plaintiff objects because in the face of conflicting evidence from the treating source and the consultative source, the treating source should have been given more weight.  However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'"  *Craig*, 76 F.3d at 590 (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)).  An ALJ will generally give more weight to opinions from a treating source, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [Claimant's] medical impairment(s) . . . ."  **20 C.F.R. § 416.927(c)(2)**.  However, a treating source's opinions "on the issue(s) of the nature and severity of [Claimant's] impairment(s)" is given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and *is not inconsistent with the other substantial evidence* in [Claimant's] case record."  *Id.*(emphasis added)  "If a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it

should be accorded significantly less weight." ***Craig***, 76 F.3d at 590.  In weighing a

medical opinion, an ALJ will consider the examining relationship; the treatment

relationship, including the length of treatment and the frequency of examination and the

nature and extent of the treatment relationship; the relevant evidence, including medical

signs and laboratory findings, supporting the opinion; the consistency of an opinion with

the record as whole; the specialization of the treating source; and any other factors

which tend to support or contradict the opinion.  **20 C.F.R. § 416.927(c)(1)-(5)**.

Plaintiff argues that her treating sources, the United Summit Center, presented

evidence that she has poor concentration, is easily distracted, has problems with the

social aspects of her life, and suffers from severe withdrawal.  Plaintiff contends that the

ALJ should have given the United Summit Center's reports greater weight.  Plaintiff

argues that the United Summit Center treating sources made longitudinal findings of the

Plaintiff and would have a better grasp on Plaintiff's abilities rather than the consultative

examiners.  To reiterate, the 2006 records (and one record from January 2007) from the

United Summit Center on which Plaintiff relies falls outside the period relevant in this

case.  The treating sources from the United Summit Center had five visits with Plaintiff

totaling two hours and forty-five minutes for all visits, with most appointments lasting

around thirty minutes.  Also, a variety of staff members and doctors met with Plaintiff,

and the same doctor did not meet with Plaintiff on each visit.

The ALJ relied on Dr. Capage's report in determining that "[t]he claimant's

symptoms and treatment support her statements regarding her mental impairments;

however, her reported degree of limitations imposed upon her functioning by these

mental impairments are not consistent with Ms. Robinson's findings at the consultative examination." R. at 17.  Dr. Capage diagnosed Plaintiff with Bipolar I Disorder and Depressed and Anxiety Disorder.  Dr. Capage's report stated that Plaintiff's degree of limitation in regards to restriction of activities of daily living were mild, and moderate degrees of limitation for difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence, or pace. R. at 364.  Dr. Capage found that Plaintiff's symptoms and history supported her statements regarding her mental impairments, but that the reported degree of limitation imposed upon her functioning by the mental impairments is not consistent with the findings made by Jennifer Robinson at her consultative examination.  R. at 366.

The ALJ also relied on Ms. Robinson's consultative mental examination, stating that she found Plaintiff's "social interactions and concentration were within normal limits, and she generally got along well with others . . . [and] would be capable of managing her personal finances." R. at 17.  Ms. Robinson's report indicated that she reviewed "[a]n initial assessment at the United Summit Center dated January 12, 2007 . . . .  It indicated a panic disorder without agoraphobia, bipolar disorder, depressed severe with psychotic features." R. at 347.  Ms. Robinson found that Plaintiff's concentration, social interactions, remote memory, and immediate memory were within normal limits, although her recent memory was severely deficient. R. at 348-49.

The ALJ gave great weight to the opinion of the state agency physicians that concluded Plaintiff could perform routine work-related activities in a low-pressure setting, manage infrequent and superficial contact with co-workers and supervisors, and would work best in more of a socially isolated setting that dealt with things rather than

people. R. at 18.  The ALJ expressly stated that she gave greater weight to this opinion because it was consistent with the other medical evidence and the residual functional capacity. *Id.*

Also, the ALJ made clear why she accorded less weight to the November 2010 opinion letter of chiropractor, Dr. George Higgs. *Id.*  The ALJ accorded his opinion letter and the chiropractor's records less weight "because he did not interpret the records into functional limitations and also, the chiropractor is not an acceptable medical source under the Social Security Administration Regulations, to establish a medical diagnosis." *Id.*

Accordingly, Plaintiff's objection is **OVERRULED**.

### C.     The ALJ's Hypothetical to the Vocational Expert

An ALJ brings in a vocational expert "to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform.  In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." ***Walker v. Brown***, 889 F.2d 47, 50 (4th Cir. 1989) (internal citations omitted).  The ALJ has "great latitude in posing hypothetical questions and need only pose those that are based on substantial evidence and accurately reflect the plaintiff's limitations." ***Farnsworth v. Astrue***, 604 F. Supp. 2d 828, 853 (N.D.W. Va. 2009) (internal citations omitted).  A hypothetical question is unimpeachable if it adequately reflects an RFC for which the ALJ had sufficient evidence.  ***Johnson v. Barnhart***, 434

F.3d 650, 659 (4th Cir. 2005).

When formulating a hypothetical question, the ALJ must identify the "physical and mental limitations imposed by the claimant's medical impairment(s)." **20 C.F.R. § 416.960(b)(2)**; *see also **Russell v. Barnhart***, 58 F. Appx 25, 30 (4th Cir. 2003). A hypothetical question "need not reference each of the claimant's impairments or diagnoses by name so long as it adequately reflects the limitations caused by those impairments." ***Brown v. Astrue***, Civil Action No. CBD-10-1238, 2013 WL 937549 *6 (D. Md. Mar. 8, 2013) (collecting district court cases in the Fourth Circuit). Additionally, the ALJ may "translate the claimant's medical impairments into functional limitations from which the vocational expert can determine whether work is available." *Id.*

In this case, the ALJ asked the VE the following hypothetical question:

> Let's assume an individual, a hypothetical individual, who is of the claimant's age, education and work history, who can do medium exertional work, who is limited to occasional climbing of stairs and ropes, I'm sorry, ramps; stairs and ramps–can't read my own writing here–who can occasionally crawl, can never climb ladders, ropes or scaffolds, who needs to avoid concentrated exposure to extreme cold, heat and hazards such as moving machinery and heights.
>
> Who can perform simple tasks consistent with SVP-2 entry-level work; who can make simple work-related decisions with few workplace changes; can have no contact with the public and occasional contact with supervisors and superficial contact with coworkers. Can such a person do the claimant's past work?

R. at 55. Plaintiff argues that the hypothetical question is improper because the ALJ utilized SVP-2 work as an impairment, and Plaintiff also contends that the ALJ "avoided placing limitations in the hypothetical by arbitrarily assuming that Ms. Ashcraft could perform SVP-2 work."

The ALJ's hypothetical question included a limitation that the hypothetical person "can perform simple tasks *consistent* with SVP-2 entry-level work." R. at 55. Specific Vocational Preparation (SVP), "is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Dictionary of Occupation Titles*, App. C (Components of the Definition Trailer). An SVP level 2 is a job where "anything beyond short demonstration up to and including 1 month" is needed to learn it. *Id.* Importantly, the ALJ did not pose the question as a hypothetical person who "can perform SVP-2 entry-level work"; rather, the question stated a person who could "perform *simple tasks*."

The ALJ set forth all of Plaintiff's limitations that were supported by the record. The ALJ imposed a proper limitation of "simple tasks" given the Plaintiff's difficulty with her recent memory. The phrase "consistent with SVP-2 entry level work," merely attempted to explain the phrase "simple task" and to reflect the Plaintiff's limitation to unskilled work. *See **Bartley v. Astrue***, 1:10-cv-00706, 2011 WL 4596703, *4 (S.D.W. Va. Sept. 30, 2011) (finding ALJ's hypothetical proper because the ALJ's "limitation to simple routine tasks involving minimal contact with the public is consistent with the regulatory definition of unskilled work."). Therefore, the ALJ's hypothetical reflected Plaintiff's mental functional limitation, and the hypothetical was not improper. Accordingly, Plaintiff's objection is **OVERRULED**.

## IV. Conclusion

For the reasons set forth above, the Court **OVERRULES** Plaintiff's objections to

Magistrate Judge Seibert's Report and Recommendation. Accordingly, the Court

adopts his Report and Recommendation and **ORDERS** as follows:

1. Plaintiff's Motion for Summary Judgment is **DENIED**;

2. Defendant's Motion for Summary Judgment is **GRANTED**;

3. The final decision of the Commissioner is **AFFIRMED**; and

4. This case is **DISMISSED** from the Court's active docket.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record.

**DATED**: April 26, 2013

GINA M. GROH
UNITED STATES DISTRICT JUDGE